Mr. Spears. Yes, Your Honor. And you reserve five minutes of your time for rebuttal. Yes, Your Honor. Thank you. Thank you. You may proceed in your aim. May it please the Court. The Board legally erred here in ignoring the 831 patents, binding admission that interleaving packets together was already known in the art, and in declining to consider the background knowledge underlying the fact that interleaving packets together was already known. The 831 patent relates to a method for correcting errors. Could you speak up just a little bit? Yes, Your Honor. The 831 patent relates to a method for correcting errors in radio frequency communications, which has two material elements. The 831 patent admitted that the first element, encoding, construed as interleaving packets together was already known in the art. My understanding of the grounds of your petition were premised on the Reed reference, teaching the encoding. And that's what it was instituted on. And then ultimately the Board concluded, no, it's not teaching. It's not teaching encoding because encoding requires interleaving, which there is now no dispute over that. And so there wasn't an extra additional argument made by your side in the petition that even if Reed doesn't teach encoding because encoding requires interleaving, it would nevertheless be obvious to modify the disclosure of Reed such that one would, instead of doing the interleaving of data between two R blocks and any given S block, you are now instead interleaving data between all of the S blocks on a given packet block. I did not see that additional extra distinct argument apart from your argument, which rested completely on the Reed reference itself disclosing the encoding. Well, we did argue that Reed taught encoding and interleaving packets together on its own, but the petition also fully set forth for two pages that the submission was there. It was already known to interleave packets together as a means for correcting error, and that's at appendix page 105 to 106. And this was his background for all the grounds in the petition. The petition starts off and says the patent admits that interleaving packets together was known in the art. The allegedly new thing is supposed to be varying the packets, the number of packets, according to signal dropout characteristics. I'm looking at A125 to A127, I guess, which is where you took on the question of encoding packets into packet blocks, and you had two basic arguments. One is encoding is a very broad concept. It can include concatenation of the S blocks. Secondly, you relied on this one passage in column two of Reed that you believe supported the idea of data interleaving perhaps between the S blocks in Reed. That's correct. But there isn't the additional argument here in the petition that says, and in addition, it would have been obvious to modify the teachings of Reed, not just relying expressly on the teachings of Reed, but to actually modify the teachings of Reed to data interleave between its S blocks in light of the background knowledge in the art that the concept of data interleaving itself was well known. You could interleave, therefore, this way, that way, any which way you want, any which way you can. Reed's particular data interleaving could be replaced by virtually any iteration of data interleaving. I'll go back and say this is an obviousness analysis and not anticipation. Because the patent already admitted that interleaving packets together was known in the art, and that's what's addressed in the background section for all the grounds, there's no need for this to be in Reed. Reed didn't need to teach this because it was already admitted that this was known. Furthermore, the petition at the same page as I'm pointing to, 105 to 106, showed that this was part of the background knowledge that any person reading Reed and reading Mahaney would have already known that this was a type of interleaving. Reed indisputably teaches interleaving, and we can talk later about whether it's teaching interleaving across X blocks or just within S blocks. But there is no dispute that anyone looking at Reed would have already known, hey, interleaving the S blocks, interleaving packets together, is another form of correcting data. And if you just take a look at, if you just are saying, is it in Reed or is it in Mahaney, and ignore this background knowledge, you're violating the precedents of KSR, which says you have to consider the background knowledge. But there's other precedent, too, which is the board is – it's your burden in these IPR proceedings to create the arguments that the board has to be confronted with and then address. And the board isn't obligated on its own initiative to start taking what you've presented and then build out in different directions. I mean there's an argument that perhaps it could or at least raise questions to the parties to therefore brief, but the board itself, as a fact finder in this tribe, doesn't have the unilateral obligation to take the clay you've given it and then start molding it in interesting different ways. I'd say the clay we gave was in the petition. Everything that was in the reply was in the petition. And all that the reply said was, the petition said, you know, Reed teaches interleaving, and it's confirming this admission in the background art set forth at page 106 and 107, 105 and 106 of the petition, that everybody knew you could interleave packets together. This has been known since 1970. So if you're in the patent owner response distinguishing Reed by saying that's not the right type of interleaving, that doesn't change the fact that everyone already knew this. The patent admitted that everyone already knew this. It was in the background knowledge, and that's proper rebuttal. Moreover, I think the precedence from this court, where the board went off track is it saw these arguments based on background knowledge as being a new and different grounds of patentability. But this court's precedent in Randall and in Ariosa is that that's just not the case, arguing the background, the prior art has to be considered in view of the background knowledge. And in Randall, a very similar argument was made, and this court held that patentability arguments based upon background art simply do not present a new theory of patentability. It's part of the consideration that the board has to go through anyway. And then later in Ariosa, following the decision in Randall, the board held that the court can't refuse to consider background art even if... Let me just ask this. I think this is the same point we've been discussing, but tell me if I'm wrong. The point can be made this way. There's a question about what Reed itself teaches, and a lot of stuff can be relevant to that. That's kind of the lesson, if it were needed, of Randall. But since we're talking about how a relevant, skilled artisan would understand a piece of prior art, you need some basis for evaluating what would already be in the relevant, skilled artisan's head. And a good basis for that would be to look at some other part that's fairly objective. But what I take to be the point we've been discussing is that by the time you got to the reply stage, the question was, even if we're wrong about how a skilled artisan would understand what Reed taught, we now want to suggest that a skilled artisan would take what Reed taught, take other knowledge, modify it in light of that other knowledge. And that seems like a different argument, and therefore legitimately rejected by the board as coming too late, made only in reply. I would say it's not a question of modifying Reed. It's a question of what someone reading Reed would understand. We're operating in a situation where, and foreshadowing a little bit of discussion of Reed, the board found Reed at worst ambiguous. It found it equally plausible that it could be talking about interleaving S blocks or interleaving R blocks. Well, for that one sentence, I think actually you've overcharacterized what the board said in its, I don't know, let's call it a quasi-mea culpa about the institution decision. It took the board to be saying nothing other than, in the institution decision, we said that every single sentence that referred to this in Reed referred to the R blocks. And then in the final written decision it said, actually, there's one sentence that doesn't do that. Now we have a task of figuring out what that sentence, in light of, understood in the context of Reed, actually teaches. And ultimately, we don't think it teaches what you say it teaches. And my point is, you're operating in a situation where you have Reed, arguably ambiguous, I would say it isn't, in terms of whether it's talking about S blocks and R blocks, that anybody coming to Reed, reading it, already knows to interleave the S blocks, dating back to 1970. They already knew that interleaving packets together was common knowledge. It was set forth in the petition that this was common background knowledge that anyone reading the reference would know. And it was even admitted in the 831 patent. There's no dispute anywhere that anybody reading this stuff would have already known to interleave packets together. So in a situation where you have a teaching in Reed of interleaving that at least comes close, you have the background knowledge of a person, a skilled artist, and they already know to interleave packets together, and the specification of the 831 patent admits that this is in the prior art. There's no room to say that interleaving packets together somehow imports patentability to these claims. So moving from interleaving R blocks to also interleaving the S blocks have no countervailing downside? Doesn't it increase the complexity, and didn't your own expert indicate that the more interleaving you do, I forget what the language was, there's more delay, at least, yeah, at least delay. So if there's any downside at all to expanding the scope of interleaving, then it seems to me you can't just look at Reed. Now you're talking about having to have evidence of why a skilled artisan would be motivated to do so, which means a different kind of point with different kind of evidence compared to what was in the petition when you were talking about what does Reed itself teach? Well, again, I go back to the petition also talked about the background knowledge, but I have two responses to that. First of all, the board's finding was that the element wasn't there anywhere, that a person of ordinary skill in the art, it would not have been obvious to this person that this thing that everyone knew how to do since 1970 could be done here. So it wasn't a motivation to combine issue, it was that the element was not present. The element was not taught by Reed. So the board, you know, to give the board a little credit here, it was doing what it believed it was required to do, which was to answer the argument you raised in your petition. And your argument in the petition was that Reed teaches this encoding, this interleaving. And the board ended up looking at it and saying, no, it doesn't, because the only interleaving that's going on is with the R blocks, and it's not in between all the S blocks in Reed. And so, therefore, the argument I'm confronted with, that Reed actually teaches this claim limitation, is wrong. Now you've got this other argument, which is, well, it would be obvious to do the modification. And so that's where I think Judge Tronto is raising the question of, well, what would that modification look like, first of all? Would it be not only continuing to interleave the two R blocks in every S block, but also, and in addition to that, interleaving all the data amongst the S blocks? Or would it be, stop interleaving R blocks. Now we're only going to interleave among the S blocks. Which one is it that is your proposed modification? I would, I think it goes too far to characterize it as a proposed modification. It's what does the reference teach? You didn't argue modification of Reed, did you? Excuse me? You didn't argue that Reed needs to be modified. You argued that this encoding of the S blocks is already in Reed. We read the modification of the S blocks is already in Reed, but even if it's not there, anyone reading Reed, or even if it's ambiguous, anyone reading Reed would have already known how to do this. And I'll push back on the argument that it wasn't in the petition, the fact that this admission was made, the fact that this background knowledge was there. Would you agree that if we find that you were seeking a modification of Reed, then that would constitute a new argument, but that if you're not, then we don't have a new argument? I think that's putting too fine a characterization on it. I mean, the point is, what would a person with skill in the art understand when they're looking at this instruction from Reed where it expressly says at column two, further protection. I think the question is a little different. The question is, what was, if I was on the panel of the board in this case, what would I have deemed my responsibility to be based on the arguments presented in front of me, based on the content of your petition? And then I would make a judgment on that. And then I would compare that to anything that I perceived to be new in your reply and then try to figure out, is that an impermissible new argument? I think that's really the issue we have now before we can even get to the question of whether it be obvious to modify Reed to interleave the S blocks. May I briefly respond to that? I'll be brief. I would say that the obligation of the board was to follow the law that prior art cannot be distinguished for failing to teach something which the specification admits is already known. There's a litany of cases on this, and that law is not disputed. And your obligation was also to follow this court's teaching in Randall and Ariosa, arguing to construe prior art in view of the background knowledge under which this stuff was already known. It's not a new theory of patentability. It's not something that needs to be separately enumerated as a grounds in the petition. It's something that simply always has to be done. So what happens if you find in your favor? Do we remand, and then what happens? If the board takes into account your reply brief? Certainly, I would urge remand rather than affirmance. I would argue here, though, that for there to be a remand, there has to be some legally cognizable issue for the board to consider. And we set forth in our blue brief that obviousness can be determined as a matter of law where the grant factors are undisputed, and if you take into account what's known in the art in this admission, interleaving packets together simply can't be some importation. I guess the question I'm asking is, does your reply brief make a difference in the case? The reply brief? The arguments that you make in your reply brief. The arguments that were rejected. I would say certainly they would. I mean, the board did not understand PharmaSTEM and that they couldn't distinguish the prior art for failing to teach what was admittedly already known. And that's clear at page 15 of the appendix. And the board affirmatively declined to consider the background knowledge.  Thank you, Your Honor. We have your argument. Thank you. Counselor Picard. Good afternoon. May it please the Court. I do want to start with the precise theory of unpatentability that Erickson put forward to the board below. So if we look at the joint appendix at 126, the last sentence of that page concludes, Accordingly, the 731 patent, that's the Reed reference, discloses that its S blocks, i.e. packets, are further encoded into packets, i.e. packet blocks, through interleaving. What that sentence, what the board reasonably concluded that sentence meant, and as did I.V., was that the argument on unpatentability was that Reed itself somehow interleaved its S blocks, not that the skilled artisan would have thought to combine a teaching of interleaving. Well, but what about the petition? I mean, the petition makes clear, and makes a very clear statement, and then leaves that statement alone, and that is that interleaving was known in the art. They do make that statement, and that statement wasn't contested in this case. So what we have to do is we have to look at that statement and say, well, a pasita begins there. And a pasita is assumed to know the prior art. And here the patent is just making clear we can see that interleaving is known in the art. Now, when I read that, I read that that means all interleaving. It doesn't just mean some subsectors of it or parts of it or new ways and creative ways of looking at interleaving. It includes it all. If I may, let's look at the patent for a moment. We don't have to. I mean, it does say that, doesn't it? It does say that, but then in the next sentence, I think, and this is where the case was decided by the board. If we look at the 831 patent at column 6, line 66, this is in the joint appendix at 61. There's this recognition that's not been disputed in this case that interleaving packets together. I'm sorry. You're going to have to slow down. I apologize. Where are you? This is in the joint appendix at 61. This is column 6 from the 831 patent at line 66. I'm sorry. And the patent says, as Judge Reyna pointed out, interleaving packets together is known in the art. But then the patent continues. It says, however, varying the number of bytes in each packet interleaved together according to the receiver speed is novel and provides substantial advantages. Look at line 40 above that. I'm there, Your Honor. OK. It's talking about the first nine packets are interleaved together. So then it goes on and talks about combination. Is that, is line 40, is what's going on in line 40 addressed by interleaving packets in line 65? Well, the general, yeah, I'm sorry. Go ahead. What the patent recognizes is that the idea of interleaving packets together was known. But the insight to vary the number of packets that are interleaved together was not known and that there are benefits to that. So when transmission conditions are poor, you interleave a fewer number of packets. When transmission conditions are high, we can interleave more packets. And that shows up in the claims. If we look at the two encoding steps, and the parties have agreed here that encoding should be construed to mean interleaving packets together. And the board confirmed that in its final written decision. We have the first encoding step, which no one disputes that that was not known in the art. Where the patentability in these claims comes in is in the varying steps. So what's, when I look at 65, and it says, however, varying the number of packets interleaved together according to receiver speed is novel. What's novel about that? Which packets you're interleaving? Or the fact that now you're interleaving with respect to speed as opposed to something else? I think both are novel. So what's novel is, let's, you can have an example where we interleave just two packets together. So we take some data from packet one and some data from packet two and we mix them up in the new packets on the transmission. And on the back end we decode them, if you will. And you might just have two when the conditions are quite poor. We'll have more, more interleaving might take nine packets. So that was an insight. That's not, as far as I know. I see all of that as interleaving. All you're doing is still interleaving. You're just interleaving different packets. And when I read this, it says that the novelty is interleaving packets together according to receiver speed. So what's novel is that you're applying interleaving now to receiver speed. Because there was a recognition in the 831 patent that receiver speed changes. That's what's novel is getting interleaving and applying it now to receiver speed. Changing the degree of interleaving based on receiver speed or signal quality, as it appears in claim one. And if we look to the final written decision, the board recognized that the point of dispute in the case wasn't whether interleaving was generally known, but whether this particular novel feature that's called out in the patent was taught by the proposed combination that Erickson put forth. If we look at the Appendix 15, the board says rather the issue is whether the prior art teaches interleaving packets together to form packet blocks in a way that results in varying the number of packets encoded into the packet block. Getting back to that. But that's what interleaving is all about. Respectfully, Your Honor, you can have static interleaving and you can have the interleaving that's described. That's my point. You can have many different types of interleaving, but interleaving is interleaving. A poseta would sit there and read a patent that says interleaving is well known in the art, and the poseta would say, well, I know all the different ways to interleave here. What's novel here is just simply that you've taken interleaving and applied it to speed. But you change the degree of interleaving based on the speed or the signal quality. So it's not enough to say we have an admission. Once the board gets there and starts determining that, what's the harm in allowing Erickson now to come back and to address that particular issue? Well, the harm is we didn't have an opportunity to address the new theory that showed up in their reply. As Judge Toronto alluded to in his question, there are some drawbacks with interleaving. It does introduce delay. If we had been confronted in the petition with the theory that, well, the skilled arson would have looked at Reed's teachings and it would have been obvious to interleave the S blocks with one another, we could have come in with a rebuttal case that looked different than the one we had. And it might have pointed out that there are tradeoffs to interleaving. It causes delay. It adds hardware complexity. For example, you've got to synchronize your receiver and transmitter so that the receiver knows, oh, in this frame, we're going to have nine interleave packets instead of two, which we had in the last one. There's a lot of complexity. We didn't have an opportunity to address that because it appeared for the first time in the reply. That would be the tradeoff there, Your Honor. Can you explain? I think this is also at the bottom of page 15. It would, I think, benefit me a little bit if you can unpack the connection, which I think this goes to what Judge Randall was talking about. The column six, column seven material in the patent at issue here says interleaving was known, but boy, not when you're varying the length. How does that novelty connect up with whether Reed teaches interleaving S blocks and not just R blocks? Right. So the way it came out in the case below, and we addressed this at the joint appendix starting at about 290. I guess at 290. So Intellectual Ventures first confronted, I take it, Your Honor, returning to 290. You'll see there we lay out the independent claim one requires encoding packets into packet blocks and varying the number of packets encoded into the packet block, and there was sort of a two-pronged assault on the Reed reference. It was pointed out that skilled artisans would not understand Reed to teach that its S blocks are in fact interleaved and then turned in the next breath to the R blocks, which had come up during Dr. Stark's cross-examination. Dr. Stark is the petitioner's expert, and this is at 293.  Each instituted independent claim requires varying the number of packets encoded in the packet block. That claim requirement stands in contrast to Reed's unambiguous language that the R blocks in an S block does not vary, and we had the same sort of concluding argument on 294. So the dispute was really whether Reed taught this. Doesn't Stark also go back and cite the patent and say that the patent admits that interleavers are well known at the time of the 831 patent's alleged intervention? He does, but that doesn't end the inquiry because, yes, the patentee recognized that interleaving was known, but in the very next breath said, but hold it. The notion of varying the degree of interleaving based on receiver speed, that's not known. That's novel. And that's what's fundamentally missing from the combination that the petitioners presented in their papers. Is there something in Reed that makes explicit what I think the board is saying about four lines up from the very bottom of page 15? The number of S blocks in one of Reed's packets can vary with thought. Where does Reed – because I take it the board is saying that's how we know that they're – not so much that's how we know, but that's why the question about whether S blocks – whether there's interleaving across S blocks is really the same as the question of whether there is interleaving when the block size and the packet size is varied because S blocks vary in Reed. The number of S blocks. I'm afraid I've lost the thread of Your Honor's question. Where in Reed does Reed indicate that the number of S blocks in one of the Reed packets varies? There can be two or four or nine. I'm having some difficulty putting my finger on the exact language. I can tell you that there's not a dispute in this case that what's going on in Reed is there's a 22nd, what it calls packet, and it changes the baud rate. And the effect of that change in baud rate is to transmit fewer or more S blocks during the 22nd duration of the packet. That's – that was not – that part of it wasn't in dispute. And that's shown in Figure 7 of Reed. Figure 7 clearly shows – Yes, thank you. Figure 7 shows – It's showing not only changing the size but also encoding. No, Your Honor. There's no finding in this case that Figure 7 teaches encoding. That would be interleaving. What it shows is concatenation. And there's not an argument in this appeal, and there wasn't an argument below, at least by the time of the final written decision, that concatenation taught encoding. I would like to turn to the question whether there was somehow a new interpretation of Reed. That issue's come up in the blue brief here. What happened in the briefing below on Reed, the fundamental dispute was whether the S blocks were, in fact, interleaved or whether there needed to be some modification. Intellectual Ventures argued, I think, quite clearly that S blocks were not interleaved. And what the board did in its final written decision was simply decide with Intellectual Ventures. It made a fact-finding about the content of the prior art. It was supported by declaration evidence from Dr. Wells. It had the benefit of the reference itself. And it adopted our interpretation. I think the only complaint that one could plausibly make, and it's not a fair one, would be to say, oh, the board also looked at Claim 6 in Reed as part of its analysis, even though Claim 6 in particular had not been cited. And I don't think that's a fair criticism of the board to say it should be faulted at looking at the entire reference now that we're on appeal in supporting this conclusion. Unless the panel has further questions, that's all I have. Thank you. Thank you. Counselor Spears? Four minutes, Your Honors. Thank you. Thank you. So I'd like to start by getting to Judge Raina's question, what was the novelty supposed to be here? The novelty never was supposed to be interleaving packets together. That's what the patent says. The novelty was supposed to be varying the number of packets encoded in a packet block based on signal dropout characteristics. The petition showed this was taught by Rita Mahaney, and the appellee never disputed this fact. I guess there's this sense of a distinction between static interleaving and dynamic interleaving, as the other side uses those terms. Data interleaving in a static sense is well known. You're always going to interleave a certain number of blocks together or a certain number of packets together. But what's going on here is a dynamic form of interleaving, as I understand it, which is you're going to change the number of packets you're going to be interleaving amongst each other based on the speed of the receiver and therefore the number of signal dropouts and fades you're going to have. The more fades you're going to have, the fewer number of individual data packets you're going to actually be interleaving in any given patent block transmission. So I think to that extent it's a little too simplistic to say there's nothing more going on here than just the garden-varied data interleaving because now we are changing up the number of packets that are being interleaved dependent on a certain variable, external variable, that is the speed of the receiver. I would respond that wasn't the court's claim construction. The court's claim construction was that encoding only required interleaving packets. There's no question. I don't think you could debate that all the claims that we're dealing with here also have this notion of varying the number of data packets you're going to be interleaving amongst each other based on the speed of the receiver. Do you disagree with that? There was never a construction that required... I need to know, do you disagree with that? Because as I understand it, it's right there in the plain face of the language of the claim. It talks in those very terms. The claims require that you encode, which means interleave, and the claims require that you vary the number of packets in a packet block based on signal dropout characteristics. There was never a construction that required that when you're interleaving you're varying the number of interleave blocks based on signal dropout characteristics. That would be my first point. It does talk about varying the number of packets encoded in the packet block according to signal dropout characteristics. You're varying the number of packets that are there. There was never a claim construction advanced by anybody which required that you're varying the number of packets being interleaved together. So at this speed you're interleaving three, at this speed you're interleaving five. There's a claim construction that required interleaving and there's a claim construction that required varying the number of packets. But even then, I would go back to Judge Reyna's point, I don't think it would be non-obvious that if you know to vary the number of packets and you know to encode all of your packets, that gets you to the claim dimension. Again, what was novel here wasn't the interleaving, it was the varying step. If you already know to interleave all your packets together according to the admission, then that gets you to the claim that's stated. The final point was— So what's your best statement in your petition? Because the other side pointed us to A126. Yes. Which, at least to me, if I just look at that page in isolation, makes it pretty clear to me that it was the petitioner's position that Reed actually teaches interleaving the S blocks. Yes. And let's just say for the moment that the board's fact-finding that it doesn't teach that is something that's supported by substantial evidence in the Reed reference itself. So the next question is, I don't see anywhere on A126 that talks about the additional argument that you're now making today, that you're now making the briefs, which is that it nevertheless would have been obvious to modify Reed so that even though Reed doesn't actually teach interleaving S blocks, there would be good grounds to do that, to actually alter the teaching of Reed so that it's actually doing something different but an obvious variation of what it actually teaches. I don't see that on A126. Is there somewhere else, perhaps A125 or A127, that says it like that? I would say at A126 it also says Reed confirms the statement in the A31 patent that interleaving packet blocks is already known in the art, and that refers back to page A105 to 106 where it's established in length. This is something that was already known. What about J904? And I'm talking about Figure 4. This is in Reed. And it says under Figure 4, it says it's a diagram of packet data comprised of plurality and concatenated S blocks, each S block being formed with plurality of interweaved R blocks. You're at 194? Yes, sir. 904, Figure 4. Okay, I was on the wrong page. And the statement in the written description about the diagram. There's the statement in the written description describing the interleaving of R blocks to form S blocks, but there's also column 2, around line 63, which says to interleaving two or more blocks of data. Further protection against bursaries may be provided by interleaving two or more blocks of data. Right, and this is the passage that the board ultimately concluded, made a fact finding on what it actually discloses, and concluded that it discloses basically interleaving the data within each of the S blocks on the S block train. That is to say, interleaving the R blocks, which is just exactly what is shown in Figure 4, interleaving the two R blocks within each S block, as is further confirmed by the disclosure in column 4, describing Figure 4. That is to say, the board made a fact finding, up and down, that this is teaching interleaving of R blocks, it's not teaching the interleaving of S blocks. And the point we make in the blue brief and in the reply brief is that there was no substantial evidence supporting that finding. The board looked at column 2 and said, well, this must be talking about what's in Figure 4. But column 2 says to interleave two or more blocks of data. Figure 4 is only showing interleaving two blocks of data. And both experts agreed that column 2 is talking about something different than what's shown in Figure 4. So there's no substantial evidence to support what the board found there. Instead, all the testimony was directly to the contrary. And if you continue reading at column 2, it says that the purpose of this interleaving was so that should burst errors occur, these will be spread equally over the interleaved blocks so that the blocks may nevertheless be recoverable. Going back to Judge Toronto's point, are there bad parts about interleaving broadly or narrowly, this is an express teaching. What you want to do is interleave broadly. And if you're just interleaving within the blocks of data, which is what the board was talking about, you're not at all accomplishing what Reid was saying. If I may have just 30 seconds to close. I think the case of Randall summarizes this, that what we're talking about is an obvious analysis. And an obvious analysis is not supposed to be centered on a blinkered focus on individual documents. And to just pick up Reid and pick up Mahaney, put your blinders on and say, I'm not even going to think about what was already known. I cannot even think about what the patent admits is already known, is doing just that. All of that was in our petition, and our reply argument simply restated what we said in our petition.